UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAREN STREHLKE, as a friend of AS, a minor,
LAURA BUCKLEY, as a friend of CB, a minor,
RENEE CICERONE, as a friend of JC, a minor,
GINA LIVERPOOL, as a friend of OL, a minor,
NENITA OZORMOOR, as a friend of ZC, a
minor, and YVONNE MADDEN, as a friend of
ZM, a minor, on behalf of themselves and all
Similarly situated members of the class,

                Plaintiffs,                         Case No. 14-11183

                v.                           Hon. Patrick J. Duggan

GROSSE POINTE PUBLIC SCHOOLS SYSTEM,
BOARD OF EDUCATION, JOAN DINDOFFER,
President of GPPSS Board of Education, in her
Official Capacity, THOMAS HARWOOD,
Superintendent of GPPSS School District, in his
Official Capacity, and C. JON DEAN, GPPSS
Deputy Superintendent for Administration, in his
Official Capacity,

                Defendants.

_____/

**OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT, (2) DENYING PLAINTIFFS' CROSS MOTION FOR
SUMMARY JUDGMENT, AND (3) DENYING AS MOOT PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION AND CLASS CERTIFICATION**

       In this civil rights action, instituted pursuant to 42 U.S.C. § 1983, Plaintiffs –

each of whom is a minor filing suit through a parent as next of friend – claim that

Defendants – a school board and various school officials – violated their rights

under the First and Fourteenth Amendments to the United States Constitution, as well as various provisions of the Michigan Constitution.  Specifically, Plaintiffs challenge the school system's demarcation of its high school attendance areas as well as an intra-district high school transfer policy on the basis that the policies violate the Equal Protection and Privileges and Immunities Clauses of the Fourteenth Amendment and the freedom of association protected by the First Amendment.   Plaintiffs also endeavor to state claims under the corresponding provisions of the Michigan Constitution.

The following motions are presently before the Court: (1) Defendants' Motion to Dismiss, which, despite its label, also serves as a summary judgment motion; (2) Plaintiffs' Cross Motion for Summary Judgment, which Plaintiffs filed in the same document as their Response to Defendants' Motion;[1] (3) Plaintiffs' Motion for Preliminary Injunction; and (4) Plaintiffs' Motion for Class Certification.  With the exception of the class certification motion, all pending motions have been fully briefed and were the subject of a lengthy hearing conducted on August 12, 2014.  For the reasons stated herein, the Court grants Defendants' Motion and denies each of the three motions filed by Plaintiffs, two of them on mootness grounds.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

---

[1] Citations in this Opinion and Order to Plaintiffs' Response ("(Pls.' Resp.)") dually refer to the response and the cross motion.

## A.    The Parties

Plaintiffs are parents representing the interests of their school-aged children, all of whom reside in the northwest corner of the City of Grosse Pointe Farms. Grosse Pointe Farms is one of six cities comprising the Grosse Pointe Public School System ("GPPSS"), a general powers public school district in Wayne County, Michigan (the "School District").  (Am. Compl. ¶¶ 8, 12, ECF No. 7.)

"Defendant [GPPSS] Board of Education (the 'Board') governs the GPPSS school district[.]"  (*Id.* ¶ 8.)  Defendant Joan Dindoffer is the President of the Board, Defendant Thomas Harwood is the Superintendent of the School District, and Defendant C. Jon Dean is the Deputy Superintendent for Administration.  (*Id.* ¶¶ 9-11.)  Dindoffer, Harwood, and Dean (the "Individual Defendants") are sued only in their official capacities.[2]

## B.    The School District

The School District serves several communities in eastern Wayne County, Michigan, specifically, the cities of Grosse Pointe, Grosse Pointe Farms, Grosse Pointe Park, Grosse Pointe Woods, all but a small area of Grosse Pointe Shores,

---

[2] The Court notes that the claims asserted against the Individual Defendants in their official capacities are in actuality claims against the entities they represent. *See, e.g.*, *Moore v. City of Harriman*, 272 F.3d 769, 776 (6th Cir. 2001) (en banc) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office . . . as such, it is no different from a suit against the State itself.") (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989)).  Naming the Individual Defendants, therefore, is redundant where the entity has also been sued.

and a portion of the City of Harper Woods.  (*Id.* ¶ 12; Def.'s Br. 2 n.3.)  Until

1968, one high school, located in Grosse Pointe Farms, served the students in the

School District.  (Am. Compl. ¶ 13.)  In 1967, presumably in response to

population growth, the District created a second high school, which was built in

Grosse Pointe Woods.[3]  (*Id.*)  Today, the original high school is known as Grosse

Pointe South High School ("South") and the school created in 1967, which opened

in 1968, is aptly named Grosse Pointe North High School ("North").

## C.    The Attendance Areas

### 1.    *Plaintiffs' Allegations*

Plaintiffs allege that "upon the creation of the second high school, the six

cities that make up the District were" placed either in the North or South

attendance area and that "no municipal boundaries were breached" in the process.

(*Id.* ¶¶ 14-15.)  Thus, any student residing in Grosse Pointe Woods, Grosse Pointe

Shores, and the portion of Harper Woods included in the School District attended

North and any student residing in Grosse Pointe, Grosse Pointe Farms, and Grosse

Pointe Park attended South.  (*Id.* ¶ 16.)  Plaintiffs further allege that because the

---

[3] There are no GPPSS high schools in Grosse Pointe Park, Gross Pointe, Grosse Pointe Shores, or Harper Woods.  (Fenton Aff. ¶ 5, Def.'s Mot. Ex. A.) Other schools are similarly distributed among the constituent municipalities.  The nine elementary schools are situated in Grosse Pointe Park (two schools), Grosse Pointe (one), Grosse Pointe Farms (two), Grosse Pointe Woods (three), and Harper Woods (one).  (*Id.*)  GPPSS operates three middle schools, one located in each of the following: Grosse Pointe Park, Grosse Pointe Farms, and Grosse Pointe Woods.  (*Id.*)  No GPPSS schools are in Grosse Pointe Shores.  (*Id.*)

high school attendance areas were divided along municipal boundaries – with "the north municipal boundary of the Farms" becoming "the de facto line of demarcation" between the two high schools – there was, "upon information and belief," no "expectation or objective to equalize enrollment [between] the two high schools[.]" (*Id.* ¶ 15.)

At some point "in recent years[,]" the Board, having undergone personnel changes since the initial division of the School District, and the GPPSS Administration "arbitrarily, capriciously and for no rational reason adopted an attendance policy to exclude . . . children in a corner area of the Farms north of Moross Road between Chalfonte Avenue and Mack Avenue[]" from the South attendance area. (*Id.* ¶ 19.) This corner of Grosse Pointe Farms is comprised "of mostly low[er income] homes[]" and houses a "higher than average concentration of minority residents." (*Id.*) As a result of the attendance zoning decision, Plaintiffs, who reside in Grosse Pointe Farms, do not attend South even though South is situated within the municipal boundaries of Plaintiffs' city of residence. Rather, Plaintiffs attend North, located in neighboring Grosse Pointe Woods.

## 2.    *Defendants' Rebuttal*

The decision to construct a second high school serving students in the School District brought forth a necessary corollary: the creation of high school attendance areas. In 1967, when the Board was devising its plan to divide students

in the School District between two high schools, GPPSS operated ten elementary schools.[4]  (Fenton Aff. ¶ 6, Defs.' Mot. Ex. A.)  Minutes from a December 11, 1967 Board meeting reflect that the elementary school attendance areas influenced the delineation of the high school boundary; in fact, the boundary between North and South was based on the preexisting elementary school attendance zones and was drawn such that there would be five elementary schools in each high school attendance zone.  (12/11/67 Bd. Minutes, attach. 1 to Fenton Aff. ("Each high school would have five elementary school attendance areas in its district.").)   It was at this Board meeting that "the current boundary between" North and South "was established[.]"  (Fenton Aff. ¶ 6; 12/11/67 Bd. Minutes.)  Despite Plaintiffs' unfounded protestations to the contrary, the boundary has not been altered since.[5] (Fenton Aff. ¶ 8 (comparing map that shows high school boundary from 1968 to the current attendance boundary and concluding that the attendance areas have remained unchanged since first adopted).)

_____

[4] One elementary school has since been shuttered.

[5] Plaintiffs alternatively contend that the Board, in the division decision, did not consider that residents of the disputed area were assigned to Monteith, an elementary school in Grosse Pointe Woods, because of concerns regarding traffic safety.  The Board knew that some parents elected to continue to send their children to Kerby, located in Grosse Pointe Farms.  This allegedly evidences that the Board never intended to split Grosse Pointe Farms in two with respect to high school assignments.

6

D.    **The Transfer Policy** [6]

For students residing in the School District, high school assignment is determined by residence within one of two attendance areas.  (Am. Compl. ¶ 17.) Students desirous of attending the high school outside of their attendance area may submit an application to the GPPSS Administration.  According to Plaintiffs, a transfer "may be approved . . . depending on [the] availability of space."  (*Id.*)

Plaintiffs suggest that most intra-district transfer applications have been made by students residing in the North attendance area who wish to attend South. (*Id.* ¶ 18.)  "Upon information and belief, for years in the past, . . . [a]ll students resid[ing] in the Farms could request" a transfer to South "and were automatically approved for enrollment" there.[7]  (*Id.*)  With the purported enactment of, or subsequent amendment to, the challenged transfer policy, the roughly fifteen high school aged students residing in Plaintiffs' area of Grosse Pointe Farms must now

---

[6] Transfer is a bit of a misnomer, as children typically apply to attend the high school outside of their attendance area prior to beginning high school.  Thus, the students are not transferring from one high school to another, but rather they are seeking enrollment at a high school outside of their attendance zone.  For purposes of this Opinion and Order the Court shall refer to the policy as the transfer policy, as this is the language employed by the parties.

[7] The Court notes that this allegation is inconsistent with Plaintiffs' assertion that the entirety of Grosse Pointe Farms was, until some point in the recent past, within the South attendance area.  (Am. Compl. ¶ 19.)

submit transfer applications.[8]  These students' applications are given no preference in the GPPSS Administration's decisionmaking process.  (*Id.* ¶ 20.)  Instead, they are required to compete with the students applying to transfer from other cities within North's attendance area.  (*Id.*)  "Upon information and belief, a greater number of students resident outside the [S]outh district than the number of students resident in Plaintiffs['] area of the Farms are approved for transfers to … South every year."  (*Id.* ¶ 21.)

Defendants respond to these allegations by submitting evidence relating to various transfer policies implemented by the Board.  In April of 1996, the Board approved the amendment of a transfer policy referred to as "Policy JEC."  (Fenton Supp. Aff. ¶ 6, Defs.' Reply, Ex. B.)  The amendment prospectively limited intra-district high school transfers if total enrollment at either high school reached 1,500, and/or if the difference in enrollment between the two schools exceeded 300

---

[8] For the school year beginning in September 2014, "of the eleven 8th-grade students residing in Plaintiffs' geographical area, four (including AS) applied for a transfer from North" to "South[,]" "while seven did not apply.  All four transfer requests were denied, per Policy 5111."  (Fenton Supp. Aff. ¶ 7, Defs.' Reply, Ex. B.)  Somewhat curiously, Defendants have not included the corresponding figures regarding the number of applicants in the North attendance area residing outside of Plaintiffs' area of Grosse Pointe Farms seeking to transfer to South nor the number of transfer applications so approved.  At the motion hearing, Plaintiffs' counsel estimated that sixty-one students transferred to South in the 2013-2014 academic year, and of those, only three or four were from the disputed area.

students.[9]  (*Id.* ¶ 4 (citing 4/15/96 Bd. Minutes attach. 2 to Fenton Supp. Aff.).)

According to enrollment figures submitted by Defendants – figures that Plaintiffs

do not contest – 1,520 students enrolled at South during the 1999-2000 academic

year, thereby triggering implementation of Policy JEC.  (Chart attach. 3 to Fenton

Aff.)  By the 2002-03 school year, enrollment at both high schools exceeded 1,500.

Although North's enrollment subsequently dropped below 1,500, the enrollment at

South remained above 1,500 until 2008, when the Board once again made changes

to the transfer policy.[10]  (*Id.*)

The Board's amendment to Policy JEC is consistent with Plaintiffs'

evidence.  Plaintiffs submitted affidavits from several long-term residents of the

northwest corner of Grosse Pointe Farms attesting to the fact that students in the

neighborhood routinely enrolled at South.  The affidavits further indicate that the

affiants had children enrolled at South during the following periods and were not

required to surmount any hurdles in the enrollment process: 1980-1992, 1987-

1993, 1990-1998, and 1996-2000.  (Affs., Pls.' Resp. Exs. 3-8.)  This evidence is

---

[9] Despite Plaintiffs' assertions that the initial division of the School District into two high school attendance areas was not motivated by a desire to equalize the student populations between the schools, the desire for some sort of parity is made manifest by these changes to Policy JEC.  Thus, whether or not Plaintiffs are correct that enrollment parity was an initial concern, it is irrelevant.

[10] At the hearing, defense counsel indicated that Policy JEC remains in place; however, an exhibit to Defendants' Reply indicates the promulgation of a new policy in 2008.

easily explained.  For the child who began attending South in 1996 (the latest year), Policy JEC had not yet been triggered, and, as defense counsel conceded at the motion hearing, transfer applications submitted by students residing in the disputed area were "rather routinely granted" prior to 1999 or 2000.

The Board did away with Policy JEC in 2008, when it overhauled the transfer policy by passing Policy 5111.  This policy provides: "Although students will normally attend the school in their own attendance area, transfers will be granted if class size, staffing, student groupings, or total enrollment in a particular building are not adversely affected."  (Policy 5111 attach. 4 to Fenton Aff.)

E.     The "Unite the Farms" Campaign

In 2013, residents of the disputed area "attended School Board meetings and spoke[ out] against the District's attendance policy[,]" hoping that such action would bring about a new policy allowing students in Plaintiffs' neighborhood to attend South with the rest of the students from Grosse Pointe Farms.  (Am. Compl. ¶ 23.)  "The Board and Administration [were] not . . . receptive to these demands." (*Id.*)  Plaintiffs allege that one Board member "was reported to have stated that their opposition to uniting" Grosse Pointe Farms in one attendance area "was 'because to do so would drag the SEV of homes in the [S]outh district down into the toilet[.]'"  (*Id.*)  Upon realizing that the "Unite the Farms" campaign had reached the end of the road, Plaintiffs instituted this lawsuit.

10

**F.      Legal Proceedings and Other Procedural Matters**

On March 24, 2014, Plaintiffs filed this action under 42 U.S.C. § 1983,

seeking to vindicate their equal protection rights secured by both the Michigan

Constitution and the Fourteenth Amendment (Count I), their rights to the privileges

and immunities of United States citizenship, as protected by the Fourteenth

Amendment (Count II), and their First Amendment right to freedom of association,

which is also guaranteed by the Michigan Constitution (Count III).[11]  Plaintiffs

seek "a declaration of the right of school children" in the northwest corner of

Grosse Pointe Farms "to attend" South "just like other Farms residents, and for

injunctive relief permanently enjoining the District from excluding school children

residing in Plaintiffs' area . . . from attending [South]."  (Am. Compl. ¶ 32.)

On April 11, 2014, Plaintiffs filed a motion for preliminary injunction, (ECF

No. 14), to which Defendants responded on April 28, 2014, (ECF No. 17).

Plaintiffs filed a supplemental reply brief on May 5, 2014.  (ECF No. 18.)

On April 16, 2014, Defendants filed a motion to dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6).  (ECF No. 16.)  Despite the label, and due to the

attachment of various exhibits, Defendants' Motion alternatively seeks summary

judgment pursuant to Federal Rule of Civil Procedure 56.  After obtaining

permission to extend the response deadline, (ECF No. 19), Plaintiffs responded on

---

[11] The lawsuit was originally filed on March 20, 2014, but the complaint was
subsequently stricken.  An amended complaint was filed on March 24, 2014.

May 20, 2014, (ECF No. 20).  In addition to serving as a response, Plaintiffs' May 20 filing is styled as a cross motion for summary judgment.[12]  Defendants replied to the motion to dismiss on June 3, 2014, (ECF No. 21), and responded to Plaintiffs' cross motion on June 9, 2014, (ECF No. 22).

The last motion filed in connection with this matter was a class certification motion, filed on June 9, 2014.  (ECF No. 23.)  The filing of this motion prompted a request for a status conference, which was held on June 18, 2014.  At the status conference, the Court informed counsel that it would address the Rule 12, but not the Rule 56, arguments presented by Defendants on the basis that the discovery period had not yet commenced.  While reviewing the parties' papers in preparation for the August 12, 2014 motion hearing, however, the Court reconsidered this position for two reasons.  First, in lieu of objecting to Defendants' request for summary judgment or filing a Rule 56(d) motion requesting additional time to take discovery, Plaintiffs both responded to Defendants' Motion and filed a summary judgment motion of their own.  Second, and related to the first, in the respective motions, both Defendants and Plaintiffs rely on evidence outside of the pleadings. Having determined that the attached exhibits adequately illuminated the issues in

---

[12] The Court takes this opportunity to note that the practice of coupling a response with a motion violates Rule 5(e) of the Electronic Filing Policies and Procedures of the Eastern District of Michigan, which provides, in pertinent part, that "a reponse or reply to a motion must not be combined with a counter-motion." Violations of this rule may result in the stricking of the offending paper. *Id.*

this case, and because consideration of these exhibits would have converted the Rule 12 motion into one for summary judgment, *see* Rule 12(d), at the beginning of the motion hearing, the Court inquired as to whether counsel would object if the Court decided Defendants' Motion on summary judgment grounds.  The attorneys answered in the negative.  The Court, therefore, construes Defendants' Motion as a motion for summary judgment and considers Plaintiffs' Cross Motion.

Lastly, the Court notes that because it has been called upon to issue a decision regarding the parties' dispositive motions at the same time as Plaintiffs' Motions for Preliminary Injunction and Class Certification, it unnecessary to address the latter motions, as both are rendered moot by the Court's decision today.

## II.     GOVERNING LEGAL STANDARD

Federal Rule of Civil Procedure 56 instructs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court assessing the appropriateness of summary judgment asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co*., 323 F.3d 386, 390 (6th Cir. 2003) (quotation omitted).

13

Courts evaluate cross motions for summary judgment under the same standard. *La Quinta Corp. v. Heartland Props., L.L.C.*, 603 F.3d 327, 335 (6th Cir. 2010) (citing *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004)). When faced with cross motions for summary judgment, each motion is examined on its own merits. *Id.*

### III.   ANALYSIS

**A.   Section 1983**

With the exception of the claims arising pursuant to the Michigan Constitution, Plaintiffs employ the statutory vehicle of 42 U.S.C. § 1983 in an effort to fasten liability to Defendants. Section 1983 confers a private right of action against any person who, acting under color of state law, causes a deprivation of a right secured by the United States Constitution or the laws of the United States. *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). Where, as here, the "person" allegedly causing the rights deprivation is a municipal entity, courts determine liability by application of a two-pronged inquiry: "(1) Whether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) Whether the [entity] is responsible for that violation." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996) (alteration in original). Because the Court answers the first inquiry in the negative, the Court need not delve into the issue of municipal liability.

14

**B.    Count I – Equal Protection Claims under the Fourteenth Amendment and Article I, § 2 of the Michigan Constitution**

In Count I, Plaintiffs allege that Defendants violated the guarantee of equal protection set forth in both the Fourteenth Amendment to the United States Constitution and Article I, § 2 of the Michigan Constitution.

The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.[13]  This provision is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985).  "Under the Equal Protection Clause, 'the states cannot make distinctions [that] . . . burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference.'" *Schellenberg v. Twp. of Bingham*, 436 F. App'x 587, 591 (6th Cir. 2011) (quoting *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005) and citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074-75

---

[13]  Michigan's equal protection provision provides that "[n]o person shall be denied the equal protection of the laws[.]"  Mich. Const. 1963, art. I, § 2.  Because Michigan courts have interpreted the state constitution's equal protection provision "as being coextensive with [its] federal counterpart[,]" the Court analyzes the equal protection claim by reference to federal constitutional law.  *Bass v. Robinson*, 167 F.3d 1041, 1050 n.4 (6th Cir. 1999) (citing *Doe v. Dep't of Soc. Servs.*, 439 Mich. 650, 487 N.W.2d 166 (1992) and *Gora v. Ferndale*, 217 Mich. App. 295, 551 N.W.2d 454 (Mich. Ct. App. 1996)).

(2000)).  As the Sixth Circuit has explained, the "threshold element of an equal

protection claim is disparate treatment; once disparate treatment is shown, the equal

protection analysis to be applied is determined by the classification used by government

decision-makers."  *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir.

2006).

  The gravamen of Plaintiffs' equal protection claim is that is that Defendants

have denied students residing in Plaintiffs' area of Grosse Pointe Farms equal

educational opportunities as compared to students residing in the rest of Grosse

Pointe Farms.  (Am. Compl. ¶ 47 ("Defendants failed to provide opportunity for

public education to the school children resident in Plaintiff's area of the Farms on

equal terms with other school children in the Farms as proposed by the Supreme

Court … in *Brown v. Board of Education* [], 347 U.S. 483 (1954)[.]").[14])  The basis

of this claim, however, is not entirely clear.  Plaintiffs do not allege that they are

---

[14] The Court is slightly troubled by the attempt to compare the state-mandated segregation in *Brown* to the attendance boundary at issue here.  Plaintiffs rely on *Brown* for the proposition that "[w]here a state has undertaken to provide an opportunity for an education in its public schools, such an opportunity is a right which must be made available to all on equal terms."  (Pls.' Resp. 12 (citing *Brown v. Bd. of Educ.*, 347 U.S. 483, 493, 74 S. Ct. 686, 691 (1954).)  This is indeed what the Supreme Court said, but context matters.  There is simply no indication that the facts of this case at all mirror those of *Brown*, that this case at all involves explicit racial classifications reminiscent of Jim Crow era, or that Defendants engaged in racial gerrymandering of the school attendance zones.  Further, while the assumption underlying the filing of this suit must be that South is the superior high school, Plaintiffs have never said as much or explained how attendance at North implicates unequal educational opportunities.

members of a protected class; rather, the only allegation at all implicating any
class-based status is Plaintiffs' assertion that the disputed area consists "of mostly
low[er income] homes[]" and houses a "higher than average concentration of
minority residents."[15]  (*Id.* ¶ 19.)  In fact, Plaintiffs appear to concede that the
attendance boundaries are not animated by any impermissible bias, as they
acknowledge that "high school enrollment in the GPPSS school district is based on
residency . . . in the attendance area of the high school[.]"  (Pls.' Resp. 10-11.)

Neither do Plaintiffs allege that the policies at issue impermissibly interfere
with the exercise of a fundamental right to public education, nor could they.  *San
Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37, 93 S. Ct. 1278, 1299 (1973)
("We have carefully considered each of the arguments supportive of the District

---

[15] It is beyond dispute that the Equal Protection Clause, passed in effort to
mitigate the effects of this nation's history of race-based enslavement, prohibits
discrimination upon the basis of race.  *See, e.g.*, *Fisher v. Univ. of Tex.*, __ U.S. __,
133 S. Ct. 2411, 2418 (2013) ("Distinctions between citizens solely because of
their ancestry are by their very nature odious to a free people, and therefore are
contrary to our traditions and hence constitutionally suspect.") (internal quotations
and citations omitted); *Washington v. Davis*, 426 U.S. 229, 239, 96 S. Ct. 2040,
2047 (1976) ("The central purpose of the Equal Protection Clause . . . is the
prevention of official conduct discriminating on the basis of race.")

To the extent that Plaintiffs' rely on socioeconomic status as a suspect class,
the Court notes that the Supreme Court "has never held that financial need alone
identifies a suspect class for purposes of equal protection analysis."  *Maher v. Roe*,
432 U.S. 464, 471, 97 S. Ct. 2376, 2381 (1977) (citations omitted); *San Antonio
Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29, 93 S. Ct. 1278, 1294 (1973) ("[T]his
Court has never heretofore held that wealth discrimination alone provides an
adequate basis for invoking strict scrutiny.").

Court's finding that education is a fundamental right or liberty and have found those arguments unpersuasive.").  To the extent that Plaintiffs seek application of strict scrutiny due to a deprivation of their fundamental right to associate, the Court analyzes, and rejects this claim *infra*.  This leaves one possible alternative: the intentional differential treatment of Plaintiffs as compared to "others similarly situated without any rational basis for the difference."  *Schellenberg*, 436 F. App'x at 591 (internal quotation marks and citations omitted).  This is known as a "class of one" theory.  *Id.*

Because no suspect class or fundamental right is implicated, the government action at issue is subject only to rational basis review.  *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005).  "To prevail on a 'class of one' equal protection claim," Plaintiffs "must prove that the government treated similarly-situated individuals differently [without a rational basis for the disparate treatment]."  *Schellenberg*, 436 F. App'x at 591 (citation omitted).  "Materiality is an integral" component to this demonstration.  *TriHealth*, 430 F.3d at 790.  It appears that Plaintiffs argue that they are similarly situated to the students residing in Grosse Pointe Farms, specifically those in the South attendance area.  Assuming for purposes of this analysis that the students are similarly situated in all material respects, there is, in this Court's view, nothing irrational about the attendance boundary or the intra-district transfer policy.

18

Under rational basis review, a plaintiff has the burden of demonstrating that the government lacked a rational basis for its action. *Id.* at 791. In fact, a governmental body "need not actually articulate at any time the purpose or rationale supporting its [action]." *Heller v. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 2642 (1993) (internal quotation marks and quotation omitted). Rather, "legislation is presumed to be valid and will be sustained in the classification drawn by the statute is rationally related to a legitimate state interest." *Spurlock v. Fox*, 716 F.3d 383, 402 (6th Cir. 2013) (quotation omitted). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* Simply put, rational basis review "is 'a paradigm of judicial restraint,' growing out of recognition that 'equal protection is not a license for courts to judge the wisdom, fairness or logic of legislative choices.'" *TriHealth*, 430 F.3d at 791 (quotation omitted).

When proceeding under a "class of one" theory, a plaintiff may demonstrate the government action lacked a rational basis "either by negativing every conceivable basis which might support the government action, or by showing that the challenged action was motivated by animus or ill-will." *TriHealth*, 430 F.3d at 788; *Heller*, 509 U.S. at 320, 113 S. Ct. at 2642 (citation omitted). Here, it appears that Plaintiffs rely upon the former theory, as the Amended Complaint alleges that

19

there was never "any expectation or objective to equalize enrollment at the two high schools[.]"[16]  (Am. Compl. ¶ 15.)  This allegation, while not entirely inconsistent with Plaintiffs' allegation that transfers between North and South are approved "depending on [the] availability of space[,]" it is at least in tension with it.  (*Id.* ¶ 17.)  Further, this speculative argument is the only argument Plaintiffs put forth in effort to demonstrate the irrationality of the attendance zones.[17]

Irrespective of the veracity of Plaintiffs' contentions that the attendance areas were not strictly enforced in the past, the undisputed evidence clearly establishes that the boundary was created so that each high school attendance zone

---

[16] Plaintiffs allege that a School Board member remarked that placing all of Grosse Pointe Farms into South's attendance area "would drag the [value] of homes in the south district down into the toilet[.]" (Am. Compl. ¶ 24.)  However, the Court is not persuaded that this comment demonstrates animus or ill-will.

[17] Plaintiffs also suggest that the "adoption of an attendance area and policy that exclude[s] students in Plaintiffs' area of the Farms from the high school located in their city was ultra vires and unlawful." (Pls.' Resp. 14, 13.)  Although Plaintiffs concede that Defendants have the authority to establish attendance areas, they argue that the boundary here is arbitrary and capricious because it excludes the disputed area from the South attendance zone, and it is therefore in contravention of state law.  (*Id.* at 13.)  As support, Plaintiffs rely on *Mason v. Bd. of Educ.*, 6 Mich. App. 364, 149 N.W.2d 239 (Mich. Ct. App. 1967).  This case, however, is not on point.  In *Mason*, the court held that as long as attendance areas are not arbitrarily fixed to exclude a particular segment of the population (that is, a racial segment), children have "no constitutionally guaranteed right to attend a public school outside of the attendance area in which he resides." *Id.* at 371, 149 N.W.2d at 243 (citation omitted).  In any event, it goes without saying that a state entity does not violate the federal constitution by failing to adhere to its statutory authority.  Thus, even if the boundary is arbitrary, it is only relevant to the extent that it informs whether there was a rational basis for the challenged action.

would correspond with the preexisting elementary school zones.  When faced with the question of how to split the School District in two, there is simply nothing irrational about the decision to place five elementary schools in one area and five in the other.  Even assuming that this was not the most sensical means of dividing the School District, "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations -- illogical, it may be, and unscientific."  *Metro. Theatre Co. v. Chicago*, 228 U.S. 61, 69-70, 3 S. Ct. 441, (1913).  Because rational basis review does not require perfect decisionmaking, rather, only rational decisionmaking, the boundary line withstands constitutional scrutiny even though it severs Grosse Pointe Farms in two.

The transfer policy is equally constitutional.  In fact, Plaintiffs' Amended Complaint, rather ironically, solidifies the rationality of the policy as it alleges that approval of intra-district transfers is dependent upon the "availability of space[]" at the receiving school.  (Am. Compl. ¶ 17.)  To the extent Plaintiffs suggest that there is no evidence the Board, in creating the attendance zones in 1967, intended to equalize enrollment between the two high schools, this suggestion is irrelevant.  The fact of the matter is that the Board subsequently determined that this was necessary to preserve the educational mission of the schools.  (*See, e.g.*, Policy 5111 ("Although students will normally attend the school in their own attendance areas, transfers will be granted if class size, staffing, student groupings, or total

21

enrollment in a particular building are not adversely affected.").)  There is nothing irrational about enacting a policy for the legitimate purpose of achieving enrollment balance and preserving educational resources.

In conclusion, "'the Fourteenth Amendment cannot be made a refuge from ill-advised laws,' and '[t]he calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility.'" *Spurlock*, 716 F.3d at 403 (alteration in original) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 281, 272, 99 S. Ct. 2281, 2296, 2292 (1979)).  Thus, that Plaintiffs want to attend South, the high school in their city of residence, does not mean that there exists some constitutionally-guaranteed right to do so.  "In the absence of any constitutional infirmity, it is not the province of the courts to dictate and supervise local school policy." *Id.*  There is no constitutional right to attend the school of one's choice with classmates of one's choice and § 1983 does not provide a vehicle for making every governmental decision with which one disagrees a constitutional tort.  Defendants are entitled to judgment as a matter of law on Count I.

## C.   Count II – Violation of Privileges and Immunities Clause

Plaintiffs also contend that the District's attendance boundary and transfer policy are unconstitutional under the Privileges and Immunities Clause of the

Fourteenth Amendment.[18]  Specifically, Plaintiffs indicate that they are United States citizens and that the challenged policies "abridge[] their rights to equal protection of the laws and freedom of association[,]" thereby abridging their privileges and immunities.  (Pls.' Resp. 15.)  This argument, rooted as it must be in the perception that the Privileges and Immunities Clause protects all of the rights set out in the Bill of Rights, need not be addressed in any depth as for over a century, "the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause" or Equal Protection Clause of the Fourteenth Amendment.  *McDonald v. City of Chicago*, 561 U.S. 742, 130 S. Ct. 3021, 3030-31 (2010).

To the extent Plaintiffs argue that this Court should hold that the right to attend public school in the city of one's residence is one of the "privileges or immunities of the citizens of the United States," this the Court will not do.  The Supreme Court interpreted the Amendment's reference to "the privileges and immunities of citizens of the United States" shortly after the Fourteen Amendment was ratified.  *See Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 36 (1873).[19]  The

---

[18] Section 1 of the Fourteenth Amendment to the United States Constitution, ratified in 1868, provides, in pertinent part: "No state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States[.]"  U.S. Const. amend. XIV, § 1.

[19] "The Privileges and Immunities Clause has been largely dormant since the *Slaughter-House Cases*[.]"  *Craigmiles v. Giles*, 312 F.3d 220, 229 (6th Cir. 2002).

23

majority concluded that the Privileges and Immunities Clause protects only those rights owing "their existence to the Federal government, its National character, its Constitution, or its laws[,]" *id.* at 79; "other fundamental rights – rights . . . that 'the State governments were created to establish and secure' were not protected by the Clause[,]" *McDonald*, 561 U.S. 742, 130 S. Ct. at 3028 (quotation omitted). Put differently, the protection afforded by the Clause "does not include rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by State law." *Glicker v. Mich. Liquor Control Comm'n*, 160 F.2d 96, 98 (6th Cir. 1947).

It simply cannot be said that the right to attend a public school in an attendance area in which a student does not reside merely because the desired school is in the same city as the student's residence is a privilege or immunity of federal citizenship. This is because the provision of education has long been thought to be within the province of the States. *Brown*, 347 U.S. at 493, 74 S. Ct. at 691 ("Today, education is perhaps the most important function of state and local governments."); *Palmer v. Bloomfield Hills Bd. of Educ.*, 164 Mich. App. 573, 577, 417 N.W.2d, 505, 507 (Mich. Ct. App. 1987). ("The federal constitution ignores education because regulation of education and school is a traditional state function.")

24

In holding that education is a not privilege and immunity of national citizenship, the Court does not intend to derogate the importance of education. Sixty years ago, the Supreme Court wrote:

> Today, education is perhaps the most important function of state and local governments.  Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society.  It is required in the performance of our most basic public responsibilities, even in service in the armed forces.  It is the very foundation of good citizenship.  Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him adjust normally to his environment.  In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

*Brown*, 347 U.S. at 493, 74 S. Ct. at 691.  This pronouncement, made "has lost none of its vitality with the passage of time."  *Rodriguez*, 411 U.S. at 29, 93 S. Ct. at 1295.  That the Supreme Court has reiterated "an abiding respect for the vital role of education in a free society" however, does not transform education into a privilege or immunity of national citizenship.  *Id.* at 30, 93 S. Ct. at 1295.[20]

Accordingly, Count II fails as a matter of law.

---

[20] *Rodriguez* addressed the question of whether education was properly considered a fundamental right protected by the Fourteenth Amendment, not the issue of whether it was a privilege and immunity of national citizenship.  However, it cannot be said that education – which "is not among the rights afforded explicit protection under our Federal Constitution," nor among the rights implicitly protected therein – becomes a privilege and immunity of national citizenship simply because it is important.  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S. Ct. 1278, 1298 (1973).

**D.**     **Count III – Freedom of Association under the First Amendment and Article I, § 3 of the Michigan Constitution**

Plaintiffs contend that because the established boundary line places them in the North attendance zone, their right to freedom of association, as guaranteed by both the First Amendment and Michigan's Constitution, has been abridged.

Neither the First Amendment nor the Michigan Constitution expressly protects freedom of association.[21]  Despite the lack of textual support, Supreme Court "cases have recognized that [the First Amendment] embraces such a right in certain circumstances."  *City of Dallas v. Stanglin*, 490 U.S. 19, 23-24, 109 S. Ct. 1591, 1594 (1989).  "The Constitution protects two distinct types of association: (1) freedom of expressive association, protected by the First Amendment, and (2) freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment but also related to the First Amendment." *Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004) (citations omitted).

Expressive association is best understood as "a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion."

---

[21] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 104 S. Ct. 3244, 3249 (1984).  This

type of associational freedom is not implicated here, as Plaintiffs do not argue that

Defendants impaired Plaintiffs' ability to engage in activities protected by the First

Amendment.  Rather, Plaintiffs' allegations are directed towards Defendants'

alleged restriction of Plaintiffs' freedom of intimate association.

"Decisions to enter into and maintain certain intimate human relationships

'must be secured against undue intrusion by the State because of the role such

relationships in safeguarding the individual freedom that is central to our

constitutional scheme.  In this respect, freedom of association receives protection

as a fundamental element of personal liberty.'"  *U.S. Citizens Ass'n v. Sebelius*,

705 F.3d 588, 598 (6th Cir. 2013) (quoting *Roberts*, 468 U.S. at 617-18, 104 S. Ct.

at 3249).  The types of relationships qualifying for the greatest measure of

constitutional protection are "those that attend the creation and sustenance of a

family – marriage; childbirth; the raising and education of children; and

cohabitation with one's relatives."  *Roberts*, 468 U.S. at 619, 104 S. Ct. at 3250

(internal citations omitted).  "[C]ourts have [further] extended protection to

personal friendships and non-marital romantic relationships."  *U.S. Citizens Ass'n*,

705 F.3d at 598; *Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004)

(assuming for summary judgment purposes that a dating relationship between two

police officers qualified as an intimate association because the two were

monogamous, had lived together, and were involved romantically and sexually); *Akers v. McGinnis*, 352 F.3d 1030, 1039-40 (6th Cir. 2003) ("Personal friendship is protected as an intimate association.") (citing *Corrigan v. City of Newaygo*, 55 F.3d 1211, 1214-15 (6th Cir. 1995)).

The determination that a particular relationship should be accorded enhanced protection is a function of certain shared characteristics: these relationships "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Roberts*, 468 U.S. at 620, 104 S. Ct. at 3250. Generally, "only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty." *Id.*, 104 S. Ct. at 3250-51. At the other end of the spectrum, an association lacking the aforementioned qualities – "such as a large business enterprise – seems remote from the concerns giving rise to this constitutional protection[, a protection meant to shield intimate associations from undue intrusion by the government]." *Id.*, 104 S. Ct. at 3251.

"Between these poles, of course, lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State." *Id.* Courts tasked with determining the limits of state power over an individual's freedom to enter into or maintain a particular

28

association, therefore, must engage in an analysis which "unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id.* (citation omitted).  While the Supreme Court in *Roberts* specifically declined to "mark the potentially significant points on this terrain with any precision[,]" the Court did provide an illustrative list of relevant considerations.  *Id.*  Thus, when analyzing whether a particular category of relationships is "worthy" of heightened protection, courts consider the "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent[.]"  *Id.*

It is beyond dispute that the relationships at issue in this case do not "attend the creation and sustenance of a family[.]"  *Id.*, 468 U.S. at 619, 104 S. Ct. at 3250. Accordingly, whether the relationships at issue qualify for the "greatest measure of constitutional protection" requires this Court to locate the relationships' place on the spectrum described above.  It is to this task that the Court now turns.

Plaintiffs insist that the high school attendance areas exclude "school children from Plaintiffs' area of the Farms from attending the high school in their city," and that Defendants, therefore, "arbitrarily and unreasonably deprived Plaintiffs' children and other school children in Plaintiffs' area of the Farms of their right to meet, interact and associate at school with their peers and other school children in their community[.]"  (Am. Compl. ¶ 57.)  Based on these allegations, it

29

is not entirely clear what the alleged protected association is.  Although Plaintiffs

appear to frame the association as one between "high school buddies and

sweethearts," the Court is not convinced, as the main thrust of Plaintiffs' argument

appears to be that residents of Grosse Pointe Farms should be able to attend the

high school located in Grosse Pointe Farms.  If this is the case, then the association

stems from residence in Grosse Pointe Farms and the ability of school-aged

children to associate with peers residing in the same community.  (*See, e.g.*, *Id.* ¶

55 (alleging that challenged attendance policies exclude Plaintiffs from their

primary avenue of meeting, becoming acquainted with, interacting, and associating

"with their peers and other school children in their community").)

To the extent that the claimed associational interest is predicated upon

Plaintiffs' place of residence, this Court believes that the association's "objective

characteristics" firmly place it closer to the attenuated end of the personal

attachment spectrum.  *Roberts*, 468 U.S. at 620, 104 S. Ct. at 3251.  Looking to

some of the *Roberts* considerations, the Court first notes that the population of

Grosse Pointe Farms, and even that of the smaller population of school-aged

children residing therein, is larger than any collection of persons that any court has

deemed small enough to warrant heightened constitutional protection.  Further,

while it is undoubtedly true that persons choose to reside in Grosse Pointe Farms,

this does not make city residents a highly-selective group of individuals.  For

30

instance, one does not choose one's neighbors.  Relatedly, it is difficult to discern any unifying purpose undergirding neighborhood choice.  While the Court does not intend to belittle the importance of community ties, a person's city of residence is more analogous to a large business enterprise than a close familial relationship.  *Id.*

To the extent that Plaintiffs believe that school-aged children residing in Grosse Pointe Farms form a protected association such that they should all attend the same high school, this position fares no better.  While the ability to choose friends within one's high school likely entails "a high degree of selectivity" and while a given student's close group of friends will likely be congenial and may even be "relative[ly] small[]," the pool of students from which to choose from is not. *Id.* at 619, 104 S. Ct. at 3250.  Lastly, although there is Sixth Circuit case law indicating that "[p]ersonal friendship is protected as an intimate association[,]" *Akers*, 352 F.3d at 1039-40 (citing *Corrigan*, 55 F.3d at 1214-15), there is simply no indication that the attendance boundaries interfere with either the continued maintenance or future formation of any personal relationships.

As with cities of residence, large public high schools are more analogous to large business enterprises than to the types of relationships typically accorded protection as intimate associations.  *Roberts*, 468 U.S. at 620,104 S. Ct. at 3251.  Just as one does not have a constitutional right to select colleagues at work, neither does an individual have a protected right to choose their classmates.

In sum, "a friendship based solely on geographical proximity is not one that is so intimate and close as to be entitled to First Amendment protection." (Defs.' Br. 22.) There is nothing intimate about the associations that Plaintiffs claim were impermissibly abridged by Defendants. Section 1983 confers a private right of action against a state actor who causes a deprivation of a right secured by the Constitution or federal law. *Harbin-Bey*, 420 F.3d at 575. Because the Court does not believe that the associations implicated here are intimate, Plaintiffs have failed to demonstrate that Defendants deprived them of their First Amendment rights.

Judgment as a matter of law in Defendants' favor is appropriate for another reason. Assuming that the attendance lines drawn in this case implicate the right to intimate association, which they do not, this alone does not trigger heightened judicial scrutiny. *Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 942 (6th Cir. 2004) ("[N]ot all government action affecting the right to intimate association receives heightened scrutiny."). Pursuant to Sixth Circuit case law, "[o]nly government action that has a 'direct and substantial interference' on intimate association receives heightened review," *id.* (quoting *Anderson*, 371 F.3d at 882), "while lesser interferences are subject to rational basis review[,]" *Anderson*, 371 F.3d at 882. In *Anderson*, the Sixth Circuit reiterated a general rule guiding courts tasked with determining whether an interference is properly categorized as a "direct and substantial" one. The court explained:

32

> [T]his court has developed a general rule that we will find "direct and substantial" burdens on intimate associations "only where a large portion of those affected by the rule are absolutely or largely prevented from [forming intimate associations], or where those affected by the rule are absolutely or largely prevented from [forming intimate associations] with a large portion of the otherwise eligible population of [people with whom they could form intimate associations]."

*Id.* at 882 (quoting *Akers*, 352 F.3d at 1040) (alterations in original).

In *Anderson*, the Sixth Circuit was confronted with a challenge to a city policy barring "dating relationships between police department employees of different ranks[.]" *Id.* Two police department employees commenced a romantic relationship and were disciplined. *Id.* at 880. Assuming, for purposes of summary judgment, that the dating relationship was an "intimate association[,]" the court declined to apply strict scrutiny even despite the First Amendment implications. *Id.* at 882. Rather, the Court applied rational basis review after determining that the policy did not directly and substantially interfere with intimate associations. Such an interference did not exist "[b]ecause [the plaintiff] continued to enjoy the ability to form intimate associations with anyone other than fellow police department employees of differing rank[.]" *Id.*

The *Akers* case involved a challenge to a Michigan Department of Corrections ("MDOC") rule "barring employees from 'Improper Relationships with Prisoners, Parolees or Probationers, Visitors or Families.'" 352 F.3d at 1033-34. This rule prohibited "improper or overly familiar conduct with [offenders] or

33

their family members or visitors." *Id.* at 1034 (internal citations omitted).  The plaintiffs, MDOC clerical employees, violated this rule by, for example, providing a former prisoner with a ride to a job interview and writing a letter to a former boyfriend who had been incarcerated, and both were disciplined.  *Id.*  The employees brought suit, arguing that MDOC's rule interfered with their personal friendships in violation of their associational rights.  *Id.* at 1039.  Recognizing that preexisting and potential relationships were impacted, the court applied rational basis review because the direct and substantial interference requirement had not been met.  The rule did "not prevent a large portion of MDOC employees from forming intimate associations; all MDOC employees continue to enjoy the ability to form intimate associations – just not with offenders [or their relatives or visitors]." *Id.* at 1040.  "Nor are those affected by the Rule absolutely or largely prevented from forming intimate associations with a large portion of the otherwise eligible population." *Id.*

In the case at bar, there is no evidence that the attendance zones constitute a direct and substantial interference to Plaintiffs' associational rights.  Defendants point out that Plaintiffs do not allege that their enrollment in North "will prevent or preclude them from forming or carrying on any sort of relationship with persons who do not attend [] North." (Defs.' Br. 22.)  Further, there is no indication that

34

Plaintiffs will be prevented from participating in Grosse Pointe Farms municipal activities by virtue of attending North.  (*Id.*; *see also* Am. Compl. ¶ 54.)

Instead of addressing these alternative avenues for socializing in a meaningful way, or of even addressing the case law requiring a "direct and substantial interference" prior to application of heightened review, Plaintiffs dismiss Defendants' arguments as "irrelevant."  (Pls.' Resp. 20.)   The Court disagrees, as "Plaintiffs' contention that they will not be able to form such relationships is at the heart of their case[.]"  (Defs.' Reply 6.)  Not only are other opportunities for forming intimate associations relevant, the Court is required to assess them, as the existence of other avenues for forming relationships negates a showing that the policy creates a direct and substantial interference with their allegedly intimate associations.  Plaintiffs' pleading demonstrates that other such opportunities exist.  Thus, even assuming that Plaintiffs' associational rights have been abridged in some way, rational basis review applies.  As with Plaintiffs' equal protection claims, there are several "plausible policy reason[s]" for dividing the School District in the way Defendants did here.  *Flaskamp*, 385 F.3d at 943 (citation omitted).  Thus, even if these reasons did not motivate the challenged action, the governmental decision is supported by a rational basis.  *Id.* (citation omitted).  As such, Defendants are entitled to judgment as a matter of law.

**IV.   REMAINING MOTIONS**

35

Having determined that Defendants are entitled to summary judgment,

Plaintiffs' Motions for Preliminary Injunction and Class Certification are moot.

## V.     CONCLUSION AND ORDER

For the reasons stated herein, the Court concludes that the absence of a

genuine dispute as to any of the material facts renders judgment as a matter of law

in favor of Defendants appropriate on all counts.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (ECF

No. 16) is **GRANTED** and that Plaintiffs' Cross Motion for Summary Judgment

(ECF No. 20) is **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs' Motions for Preliminary

Injunction (ECF No. 14) and Class Certification (ECF No. 23) are **DISMISSED**

**AS MOOT**.

Dated: September 15, 2014

                                              s/PATRICK J. DUGGAN
                                              UNITED STATES DISTRICT JUDGE


Copies to:

**Joseph T. Ozormoor, Esq.**
**Mark W. McInerney, Esq.**
**Nitya S. Lohitsa, Esq.**